### UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MICHAEL HUGHES, | ) | No. 18 B 11700 |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| CR ADVENTURES LLC, a Delaware | ) | |
| limited liability company, d/b/a CR FARMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18 A 257 |
| | ) | |
| MICHAEL HUGHES, | ) | |
| | ) | |
| Defendant. | ) | Judge Goldgar |

### <u>MEMORANDUM OPINION</u>

Michael Hughes owned and operated a produce company, National Produce Sales. From 2012 to 2017, National Produce placed orders with CR Farms for several hundred thousand dollars of potatoes and onions. CR Farms shipped the potatoes and onions, but National Produce failed to pay for more than $400,000 of the shipments. Eventually, National Produce went out of business, and Hughes ended up in bankruptcy. CR Farms then filed this adversary proceeding alleging that Hughes owes CR Farms a debt for the unpaid shipments, and the debt is nondischargeable under sections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), (a)(4).

Before the court for ruling are the parties' cross-motions for summary judgment. CR Farms moves for judgment on both its claims; Hughes cross-moves only on the section 523(a)(4)

claim. For the reasons discussed below, CR Farms' motion will be denied, and Hughes's cross-

motion will be granted.

## 1. Jurisdiction

The court has subject matter jurisdiction under 28 U.S.C. § 1334(b) and the district

court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## 2. Background

### a. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (made applicable by Fed.

R. Bankr. P. 7056). The court's main task on summary judgment is to decide whether any

material dispute of fact requires a trial. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If

not, summary judgment can be entered as a matter of law. 10A Charles Alan Wright, Arthur R.

Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2725 at 416 (2016).

When a plaintiff is the movant and would have the burden of proof at trial, he has the

initial burden on summary judgment of showing there are no factual disputes. *Celotex v. Catrett*,

477 U.S. 317, 323 (1986); 10A Wright, Miller & Kane, *supra*, § 2727.1 at 492. The plaintiff

also has the burden of showing he is entitled to judgment as a matter of law. *Custer v. Pan Am.*

*Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (stating that the movant must "show that the

uncontroverted facts entitle the party to a judgment as a matter of law" (internal quotation

omitted). That is true even when no facts are in dispute. *Wienco, Inc. v. Katahn Assocs.*, 965

F.3d 565, 568 (7th Cir. 1992) (noting that with no factual disputes, the court must "make the

-2-

further finding that . . . summary judgment is proper as a matter of law.").

### b. Summary Judgment Procedure

The bankruptcy court's local rules set out a procedure for summary judgment motions – a procedure essentially identical to the district court's procedure – designed to simplify decisions about whether material facts are in dispute. *See* L.R. 7056-1, 7056-2. The movant must submit a statement of facts consisting of short, numbered paragraphs with citations to evidence supporting each statement. L.R. 7056-1(B). The nonmovant must then respond to each statement, admitting or denying it, and including, "in the case of any disagreement," references to supporting evidence. L.R. 7056-2(A)(2)(a). The nonmovant may also a submit a statement offering additional facts, again with citations to supporting evidence. L.R. 7056-2(A)(2)(b).

Responding to a statement of facts is "straightforward" – or should be. *Maxwell v. Penn Media (In re marchFirst, Inc.)*, Nos. 01 B 24742, 03 A 1141, 2010 WL 4027723, at *2 (Bankr. N.D. Ill. Oct. 14, 2010). The respondent can admit facts, deny facts (with citations to evidence supporting the denial), or suggest under Rule 56(d) that for specified reasons essential facts cannot be presented. *Id.* He can also object that the evidence supporting a particular fact is inadmissible. *Id.* But "[t]here are no other options." *Id.* Responses of any other kind admit the facts stated. *Id.*; *see also* L.R. 7056-1(C), 7056-2(B).

### c. Material Facts

The facts are drawn from the parties' statements of fact and responses under Local Bankruptcy Rules 7056-1 and -2. No material facts are in dispute.[1]

---

[1]      The statements of fact, responses, and supporting materials are extensive. Only material facts (meaning facts affecting the outcome), or facts needed for background, are

### i. The Parties

CR Adventures LLC ("CR Farms") is an Idaho concern that sells and ships "perishable agricultural commodities" as defined in the Perishable Agricultural Commodities Act of 1930, 7 U.S.C. §§ 499a-499s ("PACA"). (Def. L.R. 7056-2(A) Resp. ¶¶ 1, 42). National Produce Sales, Inc. ("National Produce") was an Illinois company and a licensed PACA produce dealer. (*Id.* ¶¶ 13-14).

Hughes joined National Produce as an employee in 2012 and appears to have worked there until it ceased business. (*See id.* ¶ 21). For most of that time, Hughes's father, David El-Aboudi, was National Produce's sole shareholder and was named on its PACA license. (*Id.* ¶¶ 15, 19; P. L.R. 7056-1(C) Resp. ¶ 7).[2] In September 2017, El-Aboudi sold his shares to Hughes. (Def. L.R. 7056-2(A) Resp. ¶¶ 36, 38). From then on, Hughes was National Produce's sole

---

included here. *See Moore v. Wells Fargo Bank*, 908 F.3d 1050, 1054 (7th Cir. 2018).

[2]    In response to paragraph 15 of CR Farms' statement of facts, Hughes adds facts of his own. He does the same in response to other statements of fact. (*See* Def. L.R. 7056-2(A) Resp. ¶¶ 25, 45, 53, 56-57, 65, 68-69). These additional facts belonged in his separate statement under L.R. 7056-2(A)(2)(b), not in his response. *See Boyd v. City of Chi.*, 225 F. Supp. 3d 708, 717 (N.D. Ill. 2016). The reason should be obvious: the movant cannot respond to additional facts unless they appear in the nonmovant's separate statement. The additional facts in Hughes's responses have not been considered.

In response to paragraph 19 and elsewhere, Hughes says that CR Farms' statements of fact are the subject of a pending "motion to strike." Hughes filed that motion during briefing as his way of raising evidentiary objections to the material CR Farms cited as support. (Dkt. No. 59). The motion was denied. (*Id.* No. 64). Motions to strike are not the right vehicle for asserting evidentiary objections on summary judgment. *See Natural Res. Def. Council v. Illinois Power Res. Generating, LLC*, No. 1:13-cv-1181, 2018 WL 5777476, at *9 (C.D. Ill. Nov. 2, 2018); *United Steel Workers Int'l Union v. Graphic Packaging Int'l, Inc.*, No. 06 C 1188, 2007 WL 2288069, at *3 (E.D. Wis. Aug. 4, 2007); *Reid v. Climatemp, Inc. (In re 3RC Mech. & Contracting Servs., LLC)*, 505 B.R. 818, 823-24 (Bankr. N.D. Ill. 2014). Hughes should have made the objections in his response to CR Farms' statement of facts. After the motion was denied, Hughes never sought to amend his response to raise the evidentiary objections. The objections have not been considered.

shareholder as well as its president, secretary, and sole director.   (*Id.* ¶ 38).

Although the parties agree that Hughes's duties at National Produce included purchasing, sales, and payment of vendors and produce sellers (*id.* ¶ 25), they differ on how much control he exercised before he assumed ownership (*see* Def. L.R. 7056-2(A) Resp. ¶¶ 30, 41; P. L.R. 7056-1(C) Resp. ¶¶ 5, 8-9, 15).   There is no disagreement, though, that once he became the sole shareholder he had complete control of the company and its daily operations.   (Def. L.R. 7056-2(A) Resp. ¶ 39).   Hughes decided which creditors to pay and when, he controlled the proceeds from produce sales, and he directed the company's management and its policies.   (*Id.*).

### ii.  Hughes's Dealings with CR Farms

From 2012 through late November 2017, CR Farms sold large quantities of potatoes and onions to National Produce.   (*Id.* ¶¶ 16, 43-44).   Hughes placed the orders on National Produce's behalf.   (*Id.* ¶ 45).   In 2017 alone, National Produce bought truckloads of produce from CR Farms, the orders totaling nearly $450,000.   (*Id.* ¶¶ 16, 44).

On the date of each order or close to it, CR Farms sent National Produce an invoice listing the produce ordered and the price.   (*Id.* ¶ 46).   Each invoice said that a finance charge would be applied to past due accounts, and if a collection action became necessary the prevailing party would be entitled to its attorney's fees and costs.   (*Id.* ¶ 48).   Each invoice also declared that the produce sold was subject to the "statutory trust authorized by [PACA]," and CR Farms "retain[ed] a Trust claim over the[ ] commodities," any "products derived" from them, and "any receivables or proceeds" from their sale.   (*Id.* ¶ 47).

National Produce sold most of the produce it bought from CR Farms (*id.* ¶ 50) but from the beginning had problems paying for it (*id.* ¶ 52; *see also id.* ¶¶ 22, 24, 26, 54-55).   CR Farms

repeatedly demanded payment. (*Id.* ¶ 55).[3] CR Farms sent Hughes receivables reports,

sometimes several a month. (*Id.* ¶ 54). Carl Sanders, CR Farms' president, telephoned National

Produce and Hughes about the missing payments and also sent emails and faxes. (*Id.* ¶ 53). In

2015, Sanders began calling Hughes daily. (*Id.* ¶¶ 54).

In response, Hughes held CR Farms at bay. He assured Sanders he was working to raise

capital or secure financing for National Produce. (*Id.* ¶ 56). He also told Sanders more than once

that he would turn National Produce around, and the company would make good on all the

outstanding Farms invoices. (*Id.* ¶¶ 26, 56, 57). He even sent CR Farms checks – but National

Produce lacked the funds for the checks to clear, and Hughes knew it. (*Id.* ¶ 76).

Relying on Hughes's assurances, CR Farms continued to fill National Produce's orders.

(*Id.* ¶ 56). Meanwhile, National Produce paid other vendors and also paid operating expenses,

including salary, rent, insurance, and utilities. (*Id.* ¶¶ 67-69, 72-74). National Produce made

these payments with funds that could have been used to pay CR Farms. (*Id.* ¶ 75).

In March 2018, National Produce closed its doors. (*Id.* ¶ 20; P. L.R. 7056-1(C) Resp. ¶

13). When it closed, National Produce owed CR Farms $426,713.60 (Def. L.R. 7056-2(A) Resp.

¶ 60), plus $85,708.55 in finance charges and $1,885 in fees for the bounced checks (*id.* ¶¶ 58-

59).[4]

---

[3]     The facts in paragraph 55 of CR Farms' statement (as well as in paragraphs 59
and 74-76) are deemed admitted because Hughes denied them without citing supporting
evidence. *See* Local Rule 7056-2(B); *Friend v. Valley View Cmty. Unit Sch. Dist.*, 789 F.3d 707,
710 (7th Cir. 2015) (finding that the district court correctly deemed facts admitted when the non-
movant "did not provide any citation to appropriate record evidence in support of his denial").

[4]     Hughes denies that National Produce owed $426,713.60 and asserts that in 2017-
18 National Produce paid CR Farms $390,957.15. (Def. L.R. 7056-2(A) Resp. ¶ 60). But the
evidence Hughes cites, a National Produce ledger, supports the $426,713 figure. Nor is an
asserted $390,951 payment inconsistent with the balance CR Farms insists was due; National

### iii. The Bankruptcy Case and Adversary Proceeding

The next month, Hughes filed a chapter 7 bankruptcy case.  CR Farms then commenced

this adversary proceeding with a five-count complaint.  The complaint sought a declaration that

Hughes owed CR Farms a debt nondischargeable under section 523(a)(4).[5]

CR Farms later moved for leave to amend its complaint.  (Dkt. No. 21).  The idea was to

cite section 523(a)(2)(A) and so allege a second ground for nondischargeability; the facts would

stay the same.  (*Id.*).  The motion was denied as unnecessary, since claims consist of facts, not

legal theories.  (Dkt. No. 69, Tr. at 2); *see Matrix IV, Inc. v. American Nat'l Bank & Trust Co.*,

649 F.3d 539, 548 (7th Cir. 2011).  As long as the complaint's factual allegations gave adequate

notice of the section 523(a)(2)(A) claim (and Hughes never said otherwise (*see* Dkt. No. 69, Tr.

at 3)), CR Farms did not need to cite the statute itself.  *B. Sanfield, Inc. v. Finlay Fine Jewelry

Corp.*, 168 F.3d 967, 973 (7th Cir. 1999).

CR Farms now moves for summary judgment on its complaint, arguing Hughes is

responsible for National Produce's debt, and the debt is nondischargeable under section 523(a)(4)

and (a)(2)(A) of the Code.  Hughes has cross-moved for summary judgment only on the section

523(a)(4) claim.[6]  The motions are briefed and ready for ruling.

---

Produce could well have made the payment and still owed $426,713.  The precise amount owed
does not affect the outcome in any event.

[5]      Five counts or not, the complaint alleged a nondischargeability claim.  The many
counts appeared to be vestiges of a PACA complaint from a different action in a different court.

[6]      Hughes discusses section 523(a)(4) because he believes the complaint "seeks
relief solely under 11 U.S.C. § 523(a)(4)."  (Dkt. No. 63 at 7 n.4).  According to Hughes, CR
Farms' motion for leave to amend its complaint was "denied."  (*Id.* No. 45 at 12 n.7).  Not quite.
The motion was denied "as unnecessary" because an amendment to cite the statute without
changing the facts was pointless.  (*Id.* No. 69, Tr. 2-3).  Eventually, of course, a plaintiff must
identify his legal theories.  In particular, he must do so on summary judgment.  *Frye v. Bowman,
Heintz, Boscia & Vician, P.C.*, 193 F. Supp. 2d 1070, 1077 (S.D. Ind. 2002) (noting that "in

-7-

### 3. Discussion

CR Farms' motion on the section 523(a)(4) claim will be denied, and Hughes's cross-motion will be granted. On the undisputed facts, Hughes, not CR Farms, is entitled to judgment as a matter of law. As for the section 523(a)(2)(A) claim, CR Farms' motion will be denied because the undisputed facts fail to establish an element of the claim.

#### a. Section 523(a)(4)

CR Farms' motion on the section 523(a)(4) claim must be denied, and Hughes's motion granted, because National Produce was not CR Farms' fiduciary under that section.

#### i. Fiduciary

Section 523(a)(4) of the Code excepts from discharge any debt for, among other things, defalcation "while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4); *see Wachovia Sec., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 670 (Bankr. N.D. Ill. 2010). To prove a section 523(a)(4) claim, a creditor must show (1) that the debtor acted as a fiduciary to the creditor when the debt was created, and (2) that the debt was caused by fraud or defalcation. *Estate of Cora v.*

---

seeking summary judgment [plaintiffs] must identify the law which supports their claims"). But CR Farms cites both Code provisions in its summary judgment motion. (*See* Dkt. No. 51 at 2, ¶ 7). So Hughes's argument that CR Farms is trying to "alter[ ] the factual basis of its adversary complaint" (*id.* No. 63 at 4) is meritless. And his argument that the complaint fails to state a section 523(a)(2)(A) claim (*id.* No. 56 at 6) is unavailable on summary judgment. Fed. R. Civ. P. 12(h)(2) (made applicable by Fed. R. Bankr. P. 7012(b)); *Voeltz v. Bridge Charleston Invs. E, LLC*, No. 2:16-CV-2971-RMG, 2019 WL 936112, at *3 (D.S.C. Feb. 26, 2019) (stating that "a defense regarding sufficiency of the pleadings cannot be raised in a motion for summary judgment under Rule 56"); *DeMarco v. LaPay*, No. 2:09-CV-190 TS, 2011 WL 1775748, at *3 n.11 (D. Utah May 9, 2011) ("[T]he defense of failure to state a claim upon which relief can be granted may only be raised in specific instances . . . and a motion for summary judgment . . . is not among them."); *see also Illinois Bell Tel. Co. v. Global NAPS Ill., Inc.*, 749 F. Supp. 2d 819, 826 (N.D. Ill. 2010) (observing that "briefs on a motion for summary judgment are not the place . . . to argue that [a party] has failed to state a claim for relief").

*Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016); *Follett Higher Educ. Grp., Inc. v. Berman (In re Berman)*, 629 F.3d 761, 766 (7th Cir. 2011).

Whether a debtor is a "fiduciary" under section 523(a)(4) is a question of federal bankruptcy law, not underlying substantive state or federal law. *Berman*, 629 F.3d at 767. "It bears emphasis," consequently, "that not all fiduciary relationships qualify under the Bankruptcy Code." *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000). The fiduciary exception to discharge is "'strict and narrow,'" *Berman*, 629 F.3d at 767 (quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1930)), and encompasses "only 'a subset' of fiduciary obligations" that substantive state and federal law recognize, *id.* (quoting *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996)).

In this circuit, a fiduciary relationship that satisfies section 523(a)(4) arises in just two situations: (1) when there is an express trust, and (2) when there is an implied fiduciary relationship. *Id.* at 768-70; *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994).

• To prove a fiduciary relationship based on an express trust, the objecting creditor must show (1) a "clear intent to create a trust," and (2) the "hallmarks of a trust." *Berman*, 629 F.3d at 769. Hallmarks of a trust include "segregation of funds, management by financial intermediaries, and recognition that the entity in control of the assets has at most bare legal title to them." *Id.*; *In re McGee*, 353 F.3d 537, 540-41 (7th Cir. 2003).

• To prove an implied fiduciary relationship, the creditor must show the relationship was one of "special confidence." *Marchiando*, 13 F.3d at 1116. That special confidence exists when the parties have an unequal relationship, one where there is "a difference in knowledge or power between fiduciary and principal" that gives "the former a position of ascendancy over the latter." *Id.*; *see also Berman*, 629 F.3d at 769; *Frain*, 230 F.3d at 1017.

CR Farms bases its claim on an express trust, but there was nothing like that here.[2] The
relationship between CR Farms and National Produce was purely commercial. National Produce
contracted to buy produce from CR Farms and promised to pay for it. CR Farms shipped the
produce to National Produce and awaited the promised payment. Sometimes National Produce
paid for the shipments; often it did not. But the relationship bore none of the "hallmarks of a
trust." *Berman* 629 F.3d at 769. It was simply buyer-seller, and "an ordinary . . . buyer-seller
relationship, without more, is not a fiduciary relationship under section 523(a)(4)." *Berman*, 629
F.3d at 771; *see Quality Food Prods., Inc. v. Bolanos (In re Bolanos)*, 475 B.R. 641, 647 (Bankr.
N.D. Ill. 2012) ("*Bolanos I*") (finding relationship between produce buyer and seller arose out of
"an arm's-length commercial transaction"), *rev'd*, No. 12 C 7654, 2013 WL 7507846 (N.D. Ill.
Sept. 16, 2013) ("*Bolanos II*").[8]

## ii. PACA Trust

CR Farms maintains there was more. Because the CR Farms-National Produce
relationship involved buying and selling produce, not pencils or power tools, the parties' dealings
were subject to PACA. PACA imposed a statutory trust on the produce CR Farms sold as well
as the proceeds of those sales, and the statute declared National Produce a trustee holding the

---

[2] CR Farms does not contend it had an implied fiduciary relationship with National
Produce, and the contention would not have succeeded anyway. Nothing in the record suggests
the parties had a "difference in knowledge or power" so that National Produce occupied some
"position of ascendancy" over CR Farms. *Marchiando*, 13 F.3d at 1116.

[8] Although the district court reversed the bankruptcy court's decision in *Bolanos*,
the district court's decision is not precedential and need not be followed here. *See Cyrnek v.
Oliva (In re Oliva)*, 591 B.R. 328, 333 (Bankr. N.D. Ill. 2018) (observing that the decision of a
single district judge in a multi-judge district is not binding on the bankruptcy court in a later
case). As discussed below, *Bolanos I* is better reasoned and more persuasive.

produce and proceeds in trust for CR Farms' benefit. That statutory relationship, CR Farms

assumes, was a "fiduciary" one under section 523(a)(4).[2]

CR Farms is mistaken. True, a statute can create a "trust-like relation" that serves as a

"fiduciary" one under section 523(a)(4). *McGee*, 353 F.3d at 540. But to do so, the statute must

disclose a clear intent to create a trust, and the relationship under the statute must have "the

hallmarks of a trust." *Berman*, 929 F.3d at 769; *McGee*, 353 F.3d at 541. In *McGee*, for

example, the court found a landlord-tenant relationship under a city ordinance was a fiduciary

one because the ordinance required a landlord to hold its tenant's security deposit in an account

at a federally insured financial institution, barred commingling of the deposit with other assets,

and said the deposit remained the tenant's property. *McGee*, 353 F.3d at 541. These "formal

separation and ownership rules," not "the labels applied by the ordinance," were enough to

satisfy section 523(a)(4) and make the landlord's debt nondischargeable. *Id.*

In *Marchiando*, on the other hand, the court held that a lottery ticket agent was not the

state's fiduciary under section 523(a)(4) despite a statute declaring proceeds from ticket sales "'a

trust fund'" until paid, prohibiting the seller from commingling them, and granting the state a

lien on the agent's property for any unpaid proceeds. *Marchiando*, 13 F.3d at 1113 (quoting 20

ILCS 1605/10.3). Although the agent was "[t]echnically" a trustee, "[r]ealistically" she had "no

---

[2]      Assumes, because CR Farms does not discuss the question in any meaningful way
(*see* Dkt. Nos. 52, 61), and Hughes fails to address it at all (*see* Dkt. No. 56). (The question
makes an appearance only in a short footnote in Hughes's brief in support of his own summary
judgment motion (*see* Dkt. No. 45 at 14 n.10) to which CR Farms responds in kind (*see* Dkt. 55
at 11 n.5).) But the question is fair game even though the parties have left it largely untouched,
because in ruling on a summary judgment motion the court "must address . . . whether legal
theory or doctrine supports the movant's position that judgment should be entered." 10A Wright,
Miller & Kane, *supra*, § 2725.3 at 447. In doing so, "the court is not confined to the particular
propositions of law advanced by the parties." *Id.*; *see also Smith v. Freland*, 954 F.2d 343, 348
(6th Cir. 1992).

duties of a fiduciary character" until she failed to remit sale proceeds. *Id.* at 1116. Until then, "she was just a ticket agent." *Id.* The segregation requirement, criminal penalties, and so on were simply devices "to establish and enforce a lien in the proceeds, the better to collect them securely." *Id.* An arrangement like that, the court said, is "remote from the conventional trust or fiduciary setting." *Id.*; *see also Stair One, Inc. v. Hivon (In re Hivon)*, Nos. 14 B 26441, 14 A 710, 2015 WL 687124, at *5-6 (Bankr. N.D. Ill. Feb. 13, 2015) (finding that the Illinois Mechanics Lien Act did not make contractors the fiduciaries of unpaid subcontractors).

A PACA "trust" is just as remote if not more. PACA is a Depression-era statute that "comprehensively regulates the nation's produce industry." *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002); *see also Tom Lange Co. v. A. Gagliano Co.*, 61 F.3d 1305, 1307 (7th Cir. 1995). As originally enacted, PACA required produce dealers to be licensed.[10] 7 U.S.C. § 499c. It also outlawed a series of "sharp business practices," *Tom Lange*, 61 F.3d at 1308; *see* 7 U.S.C. § 499b, and subjected to civil liability dealers and others who engaged in them, 7 U.S.C. §§ 499e(a)-(b). One of the practices outlawed was the failure and refusal of dealers and others to "truly and correctly . . . account and make full payment promptly" for produce purchases. 7 U.S.C. § 499b(4).

In 1984, Congress amended PACA to bolster its objective of prompt and full payment. Congress declared that dealers hold produce, its derivatives, and proceeds from its sale "in trust for the benefit of all unpaid suppliers or sellers" until "full payment" is made. 7 U.S.C. § 499e(c)(2); *see Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 890 (7th Cir. 1999).

_____

[10]      A "dealer" is "any person engaged in the business of buying or selling in wholesale or jobbing quantities . . . any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b)(6).

To ensure these protections, sellers must give written notice of their intent to preserve them, 7

U.S.C. § 499e(c)(3), and can do so in their "ordinary and usual billing or invoice statements," 7

U.S.C. § 499e(c)(4); *see* 7 C.F.R. § 46.46(f). The trust arises when the produce is accepted.

*Patterson*, 307 F.3d at 669.

The PACA trust is a "floating" trust. 7 C.F.R. § 46.46(b); *see also Patterson*, 307 F.3d at

669. That means a buyer can use proceeds from the sale of one seller's produce to pay a different

seller – or for any other purpose, as long as the buyer maintains assets sufficient to pay his PACA

liabilities. 7 C.F.R. § 46.46(d)(1) (stating that PACA licensees must merely "maintain trust

assets" so they are "freely available to satisfy outstanding obligations to sellers"). The buyer

need not segregate produce or sale proceeds, and "[c]ommingling of trust assets is

contemplated." 7 C.F.R. § 46.46(b). Unpaid produce sellers have no claim to specific assets of

the buyer, and they share pro rata if their claims exceed the buyer's available trust assets. 7

U.S.C. § 499e(c)(2) (stating that produce, products, and proceeds are held in trust "for the benefit

of *all* unpaid suppliers or sellers" (emphasis added)); *see also Country Best v. Christopher

Ranch, LLC*, 361 F.3d 629, 632 (11th Cir. 2004) ("Because PACA trusts are intended for the

benefit of all unpaid suppliers, all beneficiaries to a trust share the same priority.").

Congress added the trust provisions to protect sellers from buyers "'who encumber or

give lenders a security interest in'" produce, products, and proceeds. *Greg Orchards*, 180 F.3d at

at 891 (quoting 7 U.S.C. § 499e(c)(1)). PACA supplies that protection by placing trust

beneficiaries "first in line among creditors for all produce-related assets," *Frio Ice, S.A. v.

Sunfruit, Inc.*, 918 F.2d 154, 156 (11th Cir. 1990). That includes secured creditors, *Patterson*,

307 F.3d at 669 ("PACA trust rights take priority over the interests of all other creditors,

including secured creditors."). In essence, the PACA trust elevates produce sellers to "a level of

superpriority." *Agri-Sales, Inc. v. United Potato Co.*, 436 F. Supp. 2d 967, 972 (N.D. Ill. 2006); *see also Patterson*, 307 F.3d at 669 (stating that PACA gives sellers "a superior secured interest").

PACA authorizes an unpaid seller to bring an action in the district court to "enforce payment from the trust." 7 U.S.C. § 499e(c)(5). The seller can recover not only from the buyer but also from those controlling it. *Sato & Co. v. S & M Produce, Inc.*, 859 F. Supp. 2d 923, 927-28 (N.D. Ill. 2012). If necessary, an unpaid seller can obtain an injunction to stop dissipation of trust assets, *see, e.g., Continental Fruit Co. v. Thomas J. Gatziolis & Co.*, 774 F. Supp. 449, 453-54 (N.D. Ill. 1991), as well as an order requiring the buyer to segregate trust funds, *Frio*, 918 F.2d at 159. But if segregation is ordered, the buyer must escrow the funds in favor of all unpaid sellers, not just one. *Id.* ("Segregation of only part of the trust solely to accommodate a beneficiary's singular interest is inappropriate because the statutory trust exists for the benefit of all unpaid produce suppliers.").

This statutory scheme does not bear any "hallmarks of a trust," *Berman*, 629 F.3d at 769, and so does not fit bankruptcy's "strict and narrow" concept of a fiduciary relationship, *Davis*, 293 U.S. at 333. For starters, a PACA trust has no *res* in any real sense. *Grede v. FCStone, LLC*, 485 B.R. 854, 877 (N.D. Ill. 2013) (observing that a PACA trust involves no "specific trust *res*"), *rev'd on other grounds*, 746 F.3d 244 (7th Cir. 2014). The trust "floats": it applies to all the buyer's PACA-related assets regardless of source. The buyer need not segregate produce and proceeds attributable to one seller from produce and proceeds attributable to another – or for that matter segregate trust assets from non-trust assets. Commingling is expressly permitted. Because no segregation is required, the seller does not continue to own his sold produce or the

-14-

sale proceeds, with the buyer having only legal title.[11] To the contrary, the buyer can use the produce and sale proceeds as he likes, provided he remains able to pay his PACA creditors. *See Pereira v. Marine Midland Bank, N.A. (In re Al Nagelberg & Co.)*, 84 B.R. 19, 21 (Bankr. S.D.N.Y. 1988) (stating that a dissipation occurs when PACA trust assets are used "without maintenance of a reserve sufficient to satisfy all unpaid vendors"). Because he can, no financial intermediary is involved, no bank or other institution holding the property. PACA simply has no "formal separation and ownership rules" that impose obligations of a fiduciary nature. *McGee*, 353 F.3d at 541.

Like the Illinois Lottery Law in *Marchiando*, PACA serves instead as a collection device. Its "trust" provisions are meant to ensure produce sellers are paid, putting them at the front of the line and giving them an unencumbered source of recovery when a buyer defaults. Before a default, though, buyers have no duties to sellers other than to maintain enough assets to pay them. Only after a seller sues and shows a buyer is dissipating assets will the buyer have anything resembling fiduciary obligations – and then only because a court has imposed them. As

---

[11]        Decisions in some other circuits disagree. *See, e.g., PACA Trust Creditors of Lenny Perry's Produce, Inc. v. Genecco Produce, Inc.*, 913 F.3d 268, 276 (2d Cir. 2019) (stating that the buyer "holds legal title to the [p]roduce and its derivatives, or proceeds but the seller retains an equitable interest in the trust pending payment" (internal quotation omitted)); *In re Delta Produce, L.P.*, 845 F.3d 609, 613 (5th Cir. 2016) (same). These decisions reach their conclusion, though, not by locating the division of legal title from beneficial interest in the statute or regulations, but by applying "ordinary principles of trust law." *See Genecco*, 913 F.3d at 276 (internal quotation omitted). In effect, these decisions confer on a PACA trust all the qualities trusts typically have. That is not the approach this circuit takes to statutory trusts and the meaning of "fiduciary" in section 523(a)(4). In this circuit, whether a statutory trust creates a fiduciary relationship under section 523(a)(4) depends on what the statute says. *McGee*, 353 F.3d at 540; *Marchiando*, 13 F.3d at 1116; *Hivon*, 2015 WL 687124, at *5 ("In determining whether a statute creates an express trust, the substance and character of the statute govern[ ]."). PACA does not say the seller retains a beneficial interest in its produce, derivatives of the produce, or the buyer's sale proceeds, with the buyer taking only legal title.

in *Marchiando*, then, the buyer may "[t]echnically" be a trustee because PACA calls him one;

"[r]ealistically," the buyer has no trust-like duties until he defaults and a court requires the

treatment PACA does not. *Marchiando*, 13 F.3d at 1116. "[B]efore the wrong is committed," in

other words, the trust has a "purely nominal existence" and the buyer is not the seller's fiduciary

under section 523(a)(4). *Id.* at 1115-16.[12/]

Citing these features of PACA, several decisions rightly find produce buyers not to be

section 523(a)(4) fiduciaries of produce sellers.  These decisions point to PACA's failure to

require segregation of "trust" assets, *Coosemans Miami, Inc. v. Arthur (In re Arthur)*, 589 B.R.

761, 766, 768 (Bankr. S.D. Fla. 2018); *Bolanos I*, 475 B.R. at 646; *Cardile Bros. Mushroom*

*Pkg., Inc. v. McCue (In re McCue)*, 324 B.R. 389, 392 (Bankr. M.D. Fla. 2005); its allowance of

"commingling of trust and non-trust assets," *McCue*, 324 B.R. at 392; its failure to maintain

ownership of property in the seller, *Bolanos I*, 475 B.R. at 646; its expectation that the buyer will

sell property covered by the trust, *Arthur*, 589 B.R. at 769; *Bolanos I*, 475 B.R. at 646; *McCue*,

324 B.R. at 392; and its function at bottom as a collection device, "assuring payment for the

goods shipped to and sold by the purchaser," *Bolanos I*, 475 B.R. at 646.  One decision also

observes – correctly – that a PACA trust imposes no meaningful trust duties on a seller until a

"showing of malfeasance." *Arthur*, 589 B.R. at 766.

Admittedly, most decisions reach the opposite conclusion, but they are unconvincing.

Many forego analysis and sign on to the majority view because it is the majority. *See, e.g.,*

---

[12/]     The Illinois Lottery Law in *Marchiando* presented a stronger case than PACA for
finding a fiduciary relationship.  Unlike PACA, the Lottery Law at least required segregation of
proceeds from ticket sales and forbade the agent from commingling them with other sale
proceeds. *Marchiando*, 13 F.3d at 1113; *see Bolanos I*, 475 B.R. at 646 (making this point about
*Marchiando* and PACA) *cf. Hivon*, 2015 WL 687124, at *6 (making the same point about
*Marchiando* and the Illinois Mechanics Lien Act).

*Alliance Shippers, Inc. v. Guarracino (In re Guarracino)*, 575 B.R. 298, 311 (Bankr. D.N.J.

2017); *Michael Farms, Inc. v. Lundgren (In re Lundgren)*, 503 B.R. 717, 721-22 (Bankr. W.D.

Wis. 2013). The rest analyze the issue inconsistently with the law in this circuit. *See, e.g.,*

*Alliance Shippers. Inc. v. Choez (In re Choez)*, 594 B.R. 142, 154 (Bankr. E.D.N.Y. 2018); *E.*

*Armata, Inc. v. Parra (In re Parra)*, 412 B.R. 99, 104-05 (Bankr. E.D.N.Y. 2009); *KGB Int'l,*

*Inc. v. Watford (In re Watford)*, 374 B.R. 184, 190 (Bankr. M.D.N.C. 2007). These decisions

look only for "(1) an identifiable trust res, (2) specific fiduciary duties, and (3) an existence prior

to and without reference to the act creating the debt." *Watford*, 374 B.R. at 190. *McGee* and

*Marchiando*, though, require "res definition, protection, and ownership in the beneficiary."

*Bolanos I*, 475 B.R. at 646 n.2 (distinguishing *Watford*, *Parra*, and similar decisions).[13/]

   *Bolanos II* is an example of this analysis. The decision finds that "a PACA trust has all

of the hallmarks of an express trust" but lists as relevant factors (1) an identifiable trust res, (2)

specific fiduciary duties, and (3) imposition of those duties before any wrong. *Bolanos II*, 2013

WL 7507846, at *2-3. Although the decision cites *McGee*, it ignores *McGee*'s list of trust

"hallmarks" – "[s]egregation of funds, management by financial intermediaries, and recognition

that the entity in control of the assets has at most 'bare' legal title to them," *McGee* 353 F.3d at

540-41 – even stating that "segregation of funds is not a mandatory element of an express trust,"

*Bolanos II*, 2013 WL 7507846, at *3. To describe the trust *res*, fiduciary duties, and imposition

of those duties, the decision quotes the statutory language. *Id.* But the statute's substance is

what counts. *McGee*, 353 F.3d at 540. *Bolanos II* fails to explain how PACA's buyer-seller

---

  [13/]  These decisions also mistakenly find an identifiable *res* and fiduciary duties
existing before the wrong. As discussed earlier, and as *Bolanos I* explains, a PACA "trust"
involves neither.

relationship satisfies *McGee* and *Marchiando*, making it a fiduciary one for purposes of section 523(a)(4).

The minority approach – in *Bolanos I*, *Arthur*, and *McCue* – accords with the narrow definition of "fiduciary" in this circuit. Because a PACA "trust" creates no fiduciary relationship under section 523(a)(4) as a matter of law, National Produce was not CR Farms' fiduciary, and Hughes cannot be liable for National Produce's debt as its controlling person. Hughes will be awarded summary judgment on the section 523(a)(4) claim. CR Farms' motion will be denied.[14]

### b. Section 523(a)(2)(A)

CR Farms' motion will also be denied on its section 523(a)(2)(A) claim. The problem with this claim is factual rather than legal: CR Farms has adduced no evidence supporting an inference that Hughes acted with fraudulent intent.

Section 523(a)(2)(A) excepts from discharge "any debt . . . for money . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition." 11 U.S.C. § 523(a)(2)(A). Although some courts suggest a single test determines nondischargeability under section 523(a)(2)(A), that section describes three separate grounds for holding a debt nondischargeable: false pretenses, false representation, and actual fraud. *National Union Fire Ins. Co. of Pittsburgh v. Krause (In re Krause)*, 526 B.R. 768, 774 (N.D. Ill. 2014); *City of Chi. v. Spielman (In re Spielman)*, 588 B.R. 198, 204 (Bankr. N.D. Ill. 2018); *Board of Educ. v. Monarrez (In re Monarrez)*, 588 B.R. 838, 858 (Bankr. N.D. Ill. 2018).

---

[14]    Because the fiduciary question is dispositive, the control and defalcation questions on which the parties expend most of their energies need not be addressed.

• A representational fraud claim concerns a debt resulting from the creditor's reliance on an express representation or omission of fact, a representation the debtor either knew was false or made with reckless disregard for its truth. *In re Davis*, 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

• A false pretenses claim concerns a debt resulting from "implied misrepresentations or conduct intended to create and foster a false impression." *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327 (Bankr. N.D. Ill. 2010). The essential nature of the claim, its "key character," is "a series of events or communications" that collectively create a false impression and induce someone to part with money or property. *Id.*

• "Actual fraud" is broader, encompassing "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000). No representation, express or implied, is necessary. *Husky Int'l Elecs., Inc. v. Ritz*, ___ U.S. ___, 136 S. Ct. 1581, 1586 (2016).

Common to each, though, is that the defendant must have acted with "'scienter, or intent to deceive.'" *Allen v. Freund (In re Freund)*, 714 F. App'x 595, 597 (7th Cir. 2018) (quoting *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016)). Intent means actual intent and depends on the debtor's subjective mental state at the time. *Parkway Bank & Trust v. Casali (In re Casali)*, 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015); *Chriswell v. Alomari (In re Alomari)*, 486 B.R. 904, 913 (Bankr. N.D. Ill. 2013). Intent can be proved through direct evidence. *Tillman Enters., LLC v. Horlbeck (In re Horlbeck)*, 589 B.R. 818, 839 (Bankr. N.D. Ill. 2018). But because direct evidence is rarely available, intent can also be proved circumstantially (or "through inference," as some decisions say) based on "the totality of the circumstances." *Id.*

-19-

CR Farms describes its section 523(a)(2)(A) claim as an actual fraud claim.[15] According to CR Farms, Hughes acted fraudulently when he used PACA trust funds to pay National Produce's operating expenses instead of its debt to CR Farms. (Dkt. No. 52 at 19).

The problem is that without evidence Hughes had the requisite intent, the claim is no more than one for breach of contract. And CR Farms has no evidence of intent. Nothing in the record – certainly nothing CR Farms has cited – suggests that Hughes's decision to have National Produce pay other creditors was a deliberate effort on his part to defraud CR Farms. True, a transfer that "impairs a creditor's ability to collect [a] debt" can constitute actual fraud. *Husky*, ___ U.S. at ___, 136 S. Ct. at 1587. True, too, Hughes's payment of other creditors likely "impaired, if not rendered impossible, CR Farms' ability to collect." (Dkt. No. 52 at 19). But a failing business's decision to pay one creditor rather than another – a common occurrence – amounts to actual fraud only when the decision is carried out with an intent to defraud the unpaid creditor. *Husky*, ___ U.S. at ___, 136 S. Ct. at 1586 (stating that actual fraud requires "wrongful intent"); *see also Dare v. Jenkins (In re Jenkins)*, 607 B.R. 270, 283 n.38 (Bankr. N.D. Tex. 2019) (rejecting the argument that *Husky* dispensed with intent as an element). CR Farms identifies no evidence, direct or circumstantial, showing Hughes acted with fraudulent intent.

Because the record on summary judgment fails to support an inference of Hughes's fraudulent intent, CR Farms has not established an element of its section 523(a)(2)(A) claim. CR Farms' motion for summary judgment on that claim will also be denied.

---

[15]    CR Farms declares that it "does not rely upon any false pretenses, false representations, or promises of future conduct." (Dkt. No. 52 at 18 n.6). The complaint might be read to state a representational fraud claim, since it alleges that Hughes induced CR Farms not to pursue collection by telling Sanders he was raising capital to keep National Produce afloat. But CR Farms disclaims that theory. A party that disclaims a legal theory will be held to its disclaimer. *In re Caesars Entm't Operating Co.*, 588 B.R. 32, 44 n.15 (Bankr. N.D. Ill. 2018).

### 4. Conclusion

The motion of plaintiff CR Adventures LLC for summary judgment on its adversary

complaint is denied.  The motion of defendant Michael Hughes for summary judgment on the

section 523(a)(4) claim in the complaint is granted.  A separate order will be entered consistent

with this opinion.

Dated:  December 18, 2019

A. Benjamin Goldgar
United States Bankruptcy Judge